**UNITED STATES of America, Appellant,**

v.

**Barry GARFINKEL, Appellee.**

No. 93–3160.

United States Court of Appeals, Eighth Circuit.

Submitted March 18, 1994.

Decided July 13, 1994.

452

Douglas Letter, Washington, DC, argued (Frank W. Hunger, Francis X. Hermann, Douglas N. Letter and Thomas M. Bondy, Washington, DC, and Margaret J. Porter and Mark S. Brown, Rockville, MD, on the brief), for appellant.

Lawrence Saul Robbins, Washington, DC, argued (Douglas A. Kelly and Steven E. Wolter, Minneapolis, MN, on the brief), for appellee.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

MAGILL, Circuit Judge.

In this appeal, the government challenges the district court's order dismissing two counts of the indictment brought against

Barry Garfinkel. The two dismissed counts charged Garfinkel with the violation of Food and Drug Administration (FDA) regulations. We reverse and remand to the district court for further proceedings.

## I. BACKGROUND

The grand jury returned a twenty-five count indictment against Garfinkel, a child psychiatrist employed by the University of Minnesota. Garfinkel, the principal investigator for an experimental drug study, was responsible for the clinical treatment and follow-up of patients receiving the experimental drug, Anafranil. The indictment charged Garfinkel in counts 24 and 25 with failing to establish and maintain accurate drug-protocol records required by FDA regulations.

The use of experimental drugs is regulated by FDA, pursuant to the authority of the Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. §§ 301–395. Drug manufacturers must apply for an exemption from the otherwise applicable premarketing approval requirements of 21 U.S.C. § 355 and § 357 by submitting an investigational new drug application (IND). An IND allows qualified experts or investigators, such as Garfinkel, to conduct investigations on the safety and effectiveness of the experimental drug. *See* 21 U.S.C. § 355(i) (1988). The pharmaceutical company filing an IND is referred to as the sponsor of the proposed new drug.

Prior to commencing any clinical study, FDA regulations require a sponsor to provide FDA with extensive information regarding the proposed study, including a detailed investigation plan known as the study protocol. All physicians participating in a study as investigators must adhere to the study protocol. Pursuant to § 355(i) of the Act, FDA regulations impose explicit recordkeeping requirements upon protocol investigators such as Garfinkel. *See* 21 C.F.R. §§ 312.62, 312.64, 312.68 (1993).

Garfinkel's motion to dismiss counts 24 and 25 of the indictment argued (1) that § 355(i), the relevant subsection of the Act, places the

entire recordkeeping burden upon the manufacturer and sponsor rather than the clinical investigator; and (2) that executive agencies do not have the authority to establish regulations enforceable by criminal penalties[1] in the absence of sufficient congressional guidelines and standards for the exercise of that authority. Garfinkel's second argument relied upon the holding of a Ninth Circuit case, *United States v. Smith,* 740 F.2d 734 (9th Cir.1984). The government argued in response that such reliance was misplaced because the FDA regulations at issue in *Smith* had been superseded by new, more explicit regulations.

The district court, dismissing the indictment, adopted *Smith*'s holding stating that "[a]lthough the regulations promulgated under § 355(i) have changed since the Ninth Circuit issued *Smith,* Congress has not amended § 355(i) to legislatively address or overrule the Ninth Circuit." *United States v. Garfinkel,* 822 F.Supp. 1457, 1460 (D.Minn. 1993). The district court noted that the government's argument ignored the Ninth Circuit's holding that "the statute's general regulatory authority which allows the Secretary to establish 'other conditions relating to the protection of public health' ... is *insufficient legislative guidance* for the issuance of regulations which, if violated, would furnish the basis for criminal liability." *Id.* at 1460–61 (emphasis added) (quoting *Smith,* 740 F.2d at 738–39) (internal quotations omitted). The district court further stated that "[t]his court concurs with the Ninth Circuit that § 355(i) contains no language *authorizing* the FDA to promulgate regulations covering protocol investigators." *Id.* at 1461 (emphasis added). After the district court dismissed counts 24 and 25 of the indictment, the government timely appealed pursuant to 18 U.S.C. § 3731 (1988).

## II. DISCUSSION

We note at the outset that two distinct arguments are articulated: (1) that § 355(i) fails to *authorize* the FDA regulations at issue, and (2) that § 355(i) provides *insufficient guidance* for the issuance of clinical-

---

1. Title 21, § 331(e) of the Act imposes criminal penalties for the failure to establish or maintain records, or make reports, required under § 355(i). 21 U.S.C. § 331(e) (Supp. IV 1992).

investigator regulations that provide for criminal penalties. The first argument raises a question of statutory construction, while the second argument raises a question of constitutional dimension, namely, the effect of the nondelegation doctrine. Upon which basis the district court relied—statutory authority or insufficient guidance—is unclear. Because both the district court and Garfinkel rely on the *Smith* opinion, we examine it for guidance.

### A.  United States v. Smith

In *Smith,* three protocol investigators were charged with, among other charges, failing to maintain accurate drug testing records in violation of 21 U.S.C. §§ 331(e), 333(b), and 355(i). 740 F.2d at 736. The district court in *Smith* dismissed the record-keeping counts, "concluding that the statute requiring the maintenance of accurate records applied only to manufacturers and sponsors of research and did not apply to the clinical investigators." *Id.*

On appeal, the Ninth Circuit affirmed, but stated,

[a]lthough the statute expressly authorizes regulations which impose affirmative duties on manufacturers and the sponsors of clinical investigations, we are reluctant to read the statute as authorizing criminal penalties for the violation of any regulation promulgated pursuant to the statute's *general* authorizing language.... The government asks that we extend the statutory obligation to include clinical investigators pursuant to the statute's *general regulatory authority* which allows the Secretary to establish 'other conditions relating to the protection of public health' before exempting manufacturers from the statute's basic drug approval application requirements, § 355(i). Such general authorizing language, however, is insufficient legislative guidance for the issuance of regulations which, if violated, would furnish the basis for criminal liability. Executive agencies have the authority to establish regulations which are enforced by criminal penalties only when Congress has provided "sufficient guidelines and standards for the exercise of the authority." *United States v.*

*Davis,* 564 F.2d 840, 844 (9th Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978); *United States v. Suquet,* 551 F.Supp. 1194, 1198 (N.D.Ill.1982); *United States v. Piatti,* 416 F.Supp. 1202, 1205 (E.D.N.Y.1976).

*Id.* at 737–38 (second emphasis added).

The Ninth Circuit held that, although there was general authority in the statute for FDA to condition experimental drug exemptions on regulations intended to protect the public health, that authority was relatively unfettered. According to the Ninth Circuit, such a lack of restraint applied to regulations imposing criminal sanctions violated the nondelegation doctrine. We derive our constitutionally-based interpretation of *Smith*'s holding not only from its language but also from its supportive citation to *Davis, Suquet,* and *Piatti:* All three cases involved challenges to Congress's delegation of authority to the Attorney General to create the controlled-drug schedules.

Subsequent to its discussion relating to the nondelegation doctrine in *Smith,* the Ninth Circuit added:

Moreover, *even if Congress had provided standards for extending the recordkeeping requirement to investigators by regulation,* the regulatory language falls short of imposing an explicit affirmative duty on the investigators to maintain accurate records.... Absent such a clear articulation of duty, we are not prepared to fasten criminal liability to the investigator who fails to fulfill his or her obligation to the sponsor.

*Smith,* 740 F.2d at 738 (emphasis added). It is unnecessary for us to decide whether this language is dicta or an alternative holding because, even assuming that the language is an alternative holding, we cannot ignore *Smith*'s initial basis for dismissing the indictment: that § 355(i) lacked *sufficient standards* for FDA to promulgate regulations imposing criminal penalties upon clinical investigators.

### B.  Analysis

Whether the district court properly dismissed counts 24 and 25 of Garfinkel's indictment depends upon whether Congress autho-

rized FDA to promulgate recordkeeping regulations applicable to clinical investigators, and, if so, whether Congress imposed sufficient constitutional restraints upon FDA to promulgate those regulations. Initially, we examine the relevant language in § 355(i)[2] and address the legal arguments in turn.

Section 355(i) instructs that the Secretary[3] *must* promulgate regulations for exempting from the operation of the new drug application process "drugs intended solely for investigational use by experts." 21 U.S.C. § 355(i). The statute suggests, but does not require, that FDA promulgate specific types of regulations pertaining to sponsors and manufacturers. *See id.* § 355(i)(1)–(3). The statute, in fact, does not require that FDA promulgate any recordkeeping regulations at all. FDA, however, is *required* to promulgate regulations which will allow for exemptions from the new drug application process. Those exemptions may apply only to "drugs intended solely for investigational use," *id.* § 355(i), by experts "to investigate the safety and effectiveness of drugs," *id.*, and those exemptions *must* be conditioned on the imposition of certain informed-consent provisions upon manufacturers or sponsors. *Id.*

### 1. Authority

Urging this court to construe § 355(i) narrowly to avoid the constitutional question,

Garfinkel argues that § 355(i) only authorizes FDA to promulgate regulations pertaining to the sponsors and manufacturers of new drugs. In turn, the government contends that the statute, as evidenced by its language and legislative history, authorizes FDA to promulgate regulations pertaining to clinical investigators.

Well aware that " 'federal statutes are to be so construed as to avoid serious doubt of their constitutionality,' " *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 841, 106 S.Ct. 3245, 3251, 92 L.Ed.2d 675 (1986) (citation omitted), we nevertheless will not ignore the legislative will in order to avoid constitutional adjudication. *Id.* We examine § 355(i), utilizing our well-known rules of statutory construction, to determine whether the statute authorized FDA to promulgate recordkeeping regulations applicable to clinical investigators such as Garfinkel.

Section 355(i), in pertinent part, provides that, "[s]uch regulations may, within the discretion of the Secretary, *among other conditions relating to the protection of the public health,* provide for conditioning such exemption upon." 21 U.S.C. § 355(i) (emphasis added). Specifically, we must determine whether the language "among other conditions relating to the protection of the public health" authorizes FDA to impose

---

**2.** Section 355(i) provides:

The Secretary *shall* promulgate regulations for exempting from the operation of the foregoing subsections of this section drugs intended solely for investigational use by experts qualified by scientific training and experience to investigate the *safety* and *effectiveness* of drugs. Such regulations *may*, within the discretion of the Secretary, among other conditions relating to the public health, provide for conditioning such exemption upon—

(1) the submission to the Secretary, before any clinical testing of a new drug is undertaken, of reports, by the manufacturer or the sponsor of the investigation of such drug, of preclinical tests (including tests on animals) of such drug....

(2) the manufacturer or the sponsor of the investigation of a new drug ... obtaining a signed agreement from each of such investigators....

(3) the establishment and maintenance of such records, and the making of such reports

to the Secretary, by the manufacturer or the sponsor ... of data (including but not limited to analytical reports by investigators) obtained as the result of such investigational use of such drug....

Such regulations shall provide that such exemption shall be conditioned upon the manufacturer, or the sponsor of the investigation, requiring that experts using such drugs for investigational purposes certify to such manufacturer or sponsor that they will inform any human beings or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives.... *Nothing in the subsection shall be construed to require any clinical investigator to submit directly to the Secretary reports on the investigational use of drugs.*

21 U.S.C. § 355(i) (emphases added).

**3.** The Secretary refers to the Secretary of Health and Human Services. For simplicity, we refer to FDA interchangeably with the Secretary.

recordkeeping requirements on clinical investigators.

The obligations imposed by FDA on clinical investigators[4] mandate the maintenance and retention, as well as the provision to the sponsor, of reports and data relating to the underlying drug trials of investigational drugs.

> A clinical investigator who falsified or destroyed original records of a drug study, and who then submitted false records to a sponsor, would clearly cause the sponsor to maintain false records and to make false reports to FDA. Moreover, were an investigator not required to maintain his or her own records (as distinct from those maintained by the sponsor), FDA would in those cases frequently be precluded from even discovering the falseness of the reports and would then review and perhaps approve drug products on the basis of false data.

52 Fed.Reg. 8798, 8827 (1987). We hold that in light of the dangers incumbent in the receipt of false data, mandating the maintenance and retention of protocol records is in the interest of the protection of the public health.

We nonetheless hold that the language of the statute is ambiguous at least as it relates to FDA's authority over clinical investigators.

> If ... Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Hence, *Chevron* instructs us to ask whether FDA's interpretation of § 355(i) "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress'[s] expressed intent." *Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991).

■ Because the statutory language is ambiguous on this precise issue, we examine the legislative history to determine whether FDA's interpretation conflicts with Congress's expressed intent. We find support in the legislative history for FDA's interpretation of the statute. Although the House of Representatives' version of the 1962 Amendments to the Act[5] originally included several prescribed conditions to be imposed by FDA regulations,[6] the Conference Report makes clear that "these are not the sole conditions imposed for the protection of the public interest." H.R.Conf.Rep. No. 2526, 87th Cong., 2d Sess. (1962), *reprinted in* 1962 U.S.C.C.A.N. 2927, 2929. We agree with Garfinkel that the legislative history indicates Congress's focus was on the manufacturers and sponsors of investigational drugs, *see generally id.*, but we find nothing in the legislative history to indicate that Congress intended to limit FDA's authority to the sponsors and manufacturers. To the contrary, we learn that Congress was concerned that any regulations promulgated by FDA have due regard for the professional ethics of the medical profession, S.Rep. No. 1744, 87th Cong.2d Sess. (1962), *reprinted in* 1962 U.S.C.C.A.N. 2884, 2891, thus indicating that Congress perceived that regulations could impact upon the physician/patient relationship. Finding that § 355(i)'s legislative history is ambiguous as to FDA's authority to impose recordkeeping obligations on clinical investigators, we hold that FDA's interpreta-

---

**4.** Such recordkeeping requirements include obligations to: maintain adequate records on the disposition of drugs, 21 C.F.R. § 312.62(a); prepare and maintain adequate and accurate patient case histories, *id.* § 312.62(b); retain required records for two years, *id.* § 312.62(c); furnish progress, safety and final reports to the drug sponsor, *id.* § 312.64; and allow FDA access to the records required pursuant to § 312.62, *id.* § 312.68.

**5.** 21 U.S.C. § 355(i) in its present form was part of the Drug Amendments of 1962.

**6.** These conditions were not included verbatim in the final version of the statute. However, the House conditions are functionally equivalent to § 355(i)(1)–(3).

tion of the statute does not conflict with Congress's expressed intent.

■ Lacking an expression of contrary intent by Congress, we cannot disturb the Secretary's construction of the statute if it reflects a permissible interpretation of the statute. "[S]ubstantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it." *Rust,* 500 U.S. at 184, 111 S.Ct. at 1767.

> FDA believes that both the language of the statute and its legislative history demonstrate that issuance of this final rule [21 C.F.R. Part 312] is within the scope of authority delegated to the Secretary by Congress under sections 505(i) and 701(a) of the act (21 U.S.C. § 355(i) and 371(a)).... The plain meaning of the statute demonstrates that Congress intended the Secretary to have the discretionary authority to impose conditions on investigational drug use in addition to those conditions specified as examples in the statute.... Before passage of the Drug Amendments of 1962 (Pub.L. 87–781), Congress was aware that FDA had proposed regulations on new drugs for investigational use, including the requirement that investigators prepare and maintain records.

52 Fed.Reg. 8798, 8827. According FDA's interpretation substantial deference, we hold that § 355(i) authorizes the promulgation of clinical-investigator recordkeeping regulations.

## 2. Nondelegation Doctrine

■ "The Constitution provides that 'all legislative Powers herein granted shall be vested in a Congress of the United States. U.S. Const., Art. 1, § 1. From this language the Court has derived the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another Branch of government." *Touby v. United States,* 500 U.S. 160, 164–65, 111 S.Ct. 1752, 1755–56, 114 L.Ed.2d 219 (1991). But,

> Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors. So long as Congress "lay[s] down by legislative act an intelligible principle to which

the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power."

*Id.* at 165, 111 S.Ct. at 1756 (quoting *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)). Generally, Congress's "intelligible principle" includes a congressional statement of policy in the area, standards to govern the delegation of authority, and a requirement for findings made by the agency in its exercise of authority. *Panama Ref. Co. v. Ryan,* 293 U.S. 388, 415, 55 S.Ct. 241, 246, 79 L.Ed. 446 (1935); *United States v. Pastor,* 557 F.2d 930, 940 (2d Cir.1977).

Garfinkel, relying on *Smith's* holding, contends that a regulation imposing criminal sanctions requires more than an "intelligible principle" to restrain the agency. The *Touby* Court, without disturbing the "intelligible principle" standard, 500 U.S. at 165, 111 S.Ct. at 1756, stated, "[o]ur cases are not entirely clear as to whether or not more specific guidance is in fact required [in the criminal context]. We need not resolve the issue today." *Id.* at 166, 111 S.Ct. at 1756 (citations omitted). The *Touby* Court held that the challenged statute, 21 U.S.C. § 201(h), "passes muster even if greater congressional specificity is required in the criminal context." *Id.*

In *Touby,* we learn Congress promulgated § 201(h) of the Controlled Substances Act to impede the development and sale without penalty of "designer drugs." *Id.* at 163, 111 S.Ct. at 1755. Apparently, some individuals were thwarting the Controlled Substances Act by quickly developing "designer drugs" not currently on any controlled substance schedule. *Id.* Section § 201(h) allowed the Attorney General to bypass temporarily the usual scheduling procedures and place a "new" drug on a controlled substance schedule, hence making its sale or distribution susceptible to criminal penalties within an abbreviated time frame. *Id.*

The Supreme Court held, in *Touby,* that § 201(h) "meaningfully constrains the Attorney General's discretion to define criminal conduct," *id.* at 166, 111 S.Ct. at 1756, be-

cause § 201(h), *bearing fewer constraints than the usual scheduling procedures,* nevertheless requires the Attorney General to follow certain standards. *Id.* The Attorney General must find that scheduling is "necessary to avoid an imminent hazard to the public safety." *Id.* That standard incorporates considerations of (1) the drug's history and current pattern of abuse; (2) the scope, duration, and significance of abuse; and (3) the risk to the public health. *Id.* In addition, a thirty-day notice of the proposed scheduling appears in the Federal Register. *Id.* Another section in the Act further requires that the Attorney General make specific findings that relate to the schedule on which the drug is placed. *Id.* at 166–67, 111 S.Ct. at 1756–57.

Similarly, we must examine § 355(i) to determine whether it imposes sufficient standards upon FDA to satisfy the constitutional requirements of the nondelegation doctrine and, accordingly, whether we agree with the Ninth Circuit's holding in *Smith.* Section 355(i)'s standards are not, however, examined in isolation. *American Power & Light Co. v. SEC,* 329 U.S. 90, 104, 67 S.Ct. 133, 141–42, 91 L.Ed. 103 (1946). Rather, we examine the language of the statute; the purpose of the Act, along with its factual background; and the statutory context in which the standards appear. *See id.*

■ Section 355(i) explicitly imposes the following constraints upon FDA's exercise of its authority in this area. It authorizes FDA to impose regulations relating to the protection of the public health. 21 U.S.C. § 355(i). However, the authorized regulations must be for the purpose of conditioning investigational drug exemptions. *Id.* Those drug exemptions may apply only to drugs intended for use by qualified experts. *Id.* And, the experts must be investigating the safety and effectiveness of the drug. *Id.* Moreover, regulations promulgated pursuant to § 355(i) may not be interpreted to require clinical investigators to submit investigational-drug reports directly to FDA. *Id.* Section 355(k) provides that "[r]egulations ... issued under ... subsection (i) of this section shall have due regard for the professional ethics of the

medical profession and the interests of patients." *Id.* § 355(k) (1988).

The purpose of the Drug Amendments of 1962 is to "strengthen and broaden existing laws in the drug field so as to bring about better, safer medicine and to establish a more effective system of enforcement of the drug laws." S.Rep. No. 1744, 87th Cong., 2d Sess. (1962), *reprinted in* 1962 U.S.C.C.A.N. 2884, 2884. The amendments were intended to "assure a safer and more reliable drug supply," *id.,* in part, by requiring a "premarketing showing that all new drugs are effective—as well as safe—for their intended uses," *id.*

Section 355(i) imposes significant guidelines upon FDA. FDA may promulgate regulations upon which investigational drug exemptions are conditioned if those regulations relate to the protection of the public health, specifically to ensure the safety and effectiveness of new drugs entering the market. 21 U.S.C. § 355(i). The regulations may not require clinical investigators to submit reports directly to FDA. *Id.* And, the regulations must have due regard for the professional ethics of the medical profession and the interests of patients. *Id.* § 355(k). We hold these standards more than satisfy the requirement that Congress lay down an "intelligible principle" to restrain the agency's authority.

■ Our final inquiry posits the question left open by *Touby. See* 500 U.S. at 166, 111 S.Ct. at 1756–57 ("Our cases are not entirely clear as to whether or not more specific guidance is in fact required [in the criminal context]. We need not resolve the issue today." (citations omitted)). We conclude that § 355(i) imposes similar, if not greater, restraints than those imposed by § 201(h) in *Touby.* We note the *Touby* regulation is subject to significantly fewer procedural requirements than the clinical-investigator regulations at issue here. The Controlled Substances Act precludes judicial review under the Administrative Procedure Act (APA) of the Attorney General's temporary scheduling orders. 21 U.S.C. § 811(h)(6) (1988). And, the temporary scheduling orders at issue in *Touby* did not require that the Attorney General first comply with the APA's require-

ments for notice and comment. *Touby*, 500 U.S. at 163, 111 S.Ct. at 1754–55.

 "[J]udicial review is a factor weighing in favor of upholding a statute against a nondelegation challenge." *United States v. Bozarov*, 974 F.2d 1037, 1042 (9th Cir.1992) (citing *Skinner v. Mid–America Pipeline Co.*, 490 U.S. 212, 218, 109 S.Ct. 1726, 1733, 104 L.Ed.2d 250 (1989); *American Power & Light*, 329 U.S. at 105, 67 S.Ct. at 142; *Yakus v. United States*, 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944)), *cert. denied,* — U.S. ——, 113 S.Ct. 1273, 122 L.Ed.2d 668 (1993); *see also Touby*, 500 U.S. at 169–70, 111 S.Ct. at 1758–59 (Marshall, J., concurring). Similarly, weighing in favor of a delegation is mandated compliance with the APA's requirements for notice and comment, 5 U.S.C. § 553 (1988). *Cf. Panama Ref. Co.*, 293 U.S. at 415, 55 S.Ct. at 246 (noting the importance of written findings): The APA mandates not only that the agency make written findings describing the regulation's basis and purpose, 5 U.S.C. § 553(c), but it also mandates publication of and comment upon the proposed rule, *id.* § 553(b)(3), (c).

 Regulations promulgated pursuant to § 355(i) are subject both to judicial review, *see* 5 U.S.C. § 702 (1988) and 21 U.S.C. § 371(a) (1988), and to the APA's requirements for notice and comment, 5 U.S.C. § 553. *See generally National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 695–700 (2d Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). Disagreeing with the Ninth Circuit's holding in *Smith*,[7] we hold that the standards enunciated by the Act, along with judicial review and the procedural requirements dictated by the APA, impose sufficient restraints upon FDA to satisfy the constitutional concerns underlying the nondelegation doctrine.

 Therefore, the district court erred when it dismissed counts 24 and 25 of Garfinkel's indictment because § 355(i) authorizes the investigator recordkeeping regulations at issue here and this delegation of

authority to FDA satisfies the constitutional concerns of the nondelegation doctrine.

### III. CONCLUSION

We reverse the district court's order dismissing counts 24 and 25 of the indictment, and we remand to the district court for further proceedings.

---

7. We note that *Smith* was decided in 1984, seven years earlier than the Supreme Court's decision in *Touby*.